Gilbert Weiss v. Commissioner.
Weiss v. Commissioner
Docket No. 44708.
United States Tax Court
T.C. Memo 1954-51; 1954 Tax Ct. Memo LEXIS 195; 13 T.C.M. (CCH) 502; T.C.M. (RIA) 54157; May 27, 1954, Filed *195 Petitioner's loss on preliminary development expenses for an unsuccessful real estate venture is not deductible in the year prior to his withdrawal from the enterprise. Martin A. Rosenberg, Esq., 1724 Arcade Building, St. Louis, Mo., for the petitioner. Frank C. Conley, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves a redetermination of a deficiency in the petitioner's income tax for the calendar year 1947 in the amount of $6,374.88. Part of *196 the deficiency results from the disallowance of an expense deduction in the amount of $249.33 which is not contested. The remainder of the deficiency results from the disallowance of a deduction for a loss incurred on a real estate enterprise which did not materialize after petitioner had spent a substantial sum in necessary development of the proposal. The amount of the loss is not in dispute. The only question is whether the petitioner is entitled to the loss in 1947 or some other year. Findings of Fact The petitioner, Gilbert Weiss, filed his individual income tax return for the calendar year 1947 with the collector of internal revenue for the first district of Missouri. During 1946, the petitioner, a practicing attorney, J. Ben Miller, a realtor, and Edward T. Hanlon, a consulting architect and engineer, entered into a joint venture to promote the construction of a multiple housing project near the city and county boundary of St. Louis, Missouri. The plan of the venturers was to develop a housing project with Federal assistance under the provisions of Title VI, section 608, of the Federal Housing Act. The venture was called Norland, Inc., although not formally incorporated, *197 and the development was sometimes called the Norland Project. It was agreed orally among the participants that the petitioner and J. Ben Miller were to advance in equal shares the money required for the preparation of the plans and specifications and Hanlon was to prepare the plans and furnish all the engineering and architectural data for the project. The petitioner was also to provide legal services for the enterprise and Miller was to provide the financial and real estate services. The group obtained an option on a 22-acre tract on July 22, 1946, for $2,000. The option was taken in the name of one of the employees of Miller's real estate firm. The option was to expire on September 15, 1946. However, the option period was extended to October 15, 1946, on payment of $500, and further extended to January 15, 1947, on payment of $500. The option was then extended to April 15, 1947, on payment of $1,000, and to October 15, 1947, for an additional $1,000. The participants developed preliminary plans for the project and obtained a tentative commitment on a loan from a mortgage brokerage firm, Investors Syndicate, conditioned on F.H.A. approval of the project and guaranty of the loan. *198 Application was made to the F.H.A. for approval of the plans of the development. In October, 1947, the Federal agency informed the members of the venture that its estimate of the cost of the project was $180,000 more than the estimate made by the joint venture. The agency required the deposit of this sum in escrow before it would guarantee the mortgage loan. Neither the petitioner nor Miller, the financial contributors to the venture, were able to provide this sum from their private sources, nor were they able to obtain the money from any other source. Consequently, the loan guarantee was not obtained and the Investors Syndicate withdrew its commitment on the loan on November 5, 1947. The prospects for success of the venture were considerably diminished by the preceding developments. Petitioner announced to his associates that he desired to withdraw from the enterprise and, in December, he and Miller balanced the accounts of the venture. The only assets were the plans and blueprints for the project and office furniture and equipment valued by the associates at $320. Early in January, 1948, petitioner paid the final installment of his share of the expenses of the enterprise to December 31, 1947. *199 Petitioner continued to bear a share of the expenses of operating the office occupied by the Norland Project in the months of January and February, 1948. These expenses included rent and telephone expense. Petitioner also made a trip to Washington, D.C., on behalf of the project in 1948. The object of the trip was to determine whether a change in the law regarding F.H.A. guaranty was favorable to the project. In January, 1948, the petitioner was approached by Leo Laughren, an attorney, concerning the possibility of having one of his clients, the H. B. Deal and Co., take over the Norland Project from the joint venture. Toward this end, the petitioner discussed the proposition with Horace Deal, president of H. B. Deal and Co., in the early part of January, 1948. At this stage, petitioner was interested in recouping the substantial expenditures he had made on the project and it was understood that if Deal and Company took over, petitioner and his associates would be reimbursed for their expenses and withdraw from the project. Deal examined the plans and conferred with Hanlon over the next several months and had under consideration the proposition until the end of June, 1948. However, *200 ultimately Deal estimated that he could not construct the project within the cost estimated by Hanlon, and no way was discovered to reduce the cost. Consequently, Deal declined to take over from the joint venture. On September 1, 1948, E. M. Layton, agent for the owners of the optioned tract, wrote petitioner reciting that the option had expired on October 31, 1947; that because of the petitioner's representations in March, 1948, concerning the consideration of the proposition by H. B. Deal and Co., the owners had held the land available for the project but now the owners considered the option expired and the earnest money forfeited. In reply to this letter and in confirmation of subsequent conversations with the owners, the petitioner wrote to Layton on November 12, 1948, requesting that the "option be extended until January 15th", 1949, in consideration of an increase in the purchase price from $55,000 to $60,000. The letter recited that: "Since the option heretofore granted on the 21 1/2 acres more or less belonging to your clients has expired, we have been attempting to bring the matter to a point where a cooperative housing project could be built upon the land involved. *201 The matter has been qualified by the Securities Department of the State, and a permit has been issued for the sale of the stock, and the plans are now being processed by the Federal Housing Administration. The prospectus has been prepared and tentative arrangements for advertising have been made. Final determination as to whether the project can be built should be available immediately after the advertising has been run." This proposal was accepted by the owners. Petitioner's total loss on the unsuccessful venture was $21,376.69. He deducted $15,633.71 of this sum on his return for 1947. This amount had been spent by him as his share of the loss prior to December 31, 1947. Petitioner deducted $5,742.98 on his return for 1948. This sum was expended in 1948. Opinion ARUNDELL, Judge: The only question involved in this case is whether the petitioner is entitled to deduct some of the loss sustained in his unsuccessful real estate venture in 1947, and the remainder in 1948. The respondent would apparently allow the petitioner to deduct the entire amount of the loss in 1948, but not split the loss between the two years as petitioner has on his returns for 1947 and 1948. The legal *202 principles applicable to this situation are now well established. Losses deductible by an individual under the provisions of section 23(e)(2) * must accrue from closed and completed transactions within the taxable period for which they are claimed. The end or closing of the transaction must be fixed by some identifiable and fixed event. Regulations 111, section 29.23 (e)(1)(b); . These determinations, moreover, are to be made by practical tests, . Neither side disputes these basic principles. Petitioner contends that he withdrew from the joint venture at the end of 1947 after failure to secure F.H.A. support and that he settled accounts with his associates *203 as of December 31, 1947. He claims that the announcement of his withdrawal and the balancing of accounts are sufficiently identifiable events to mark the end of his participation in the enterprise. Such activities as he engaged in during 1948 were on behalf of a different endeavor, he argues. No longer was he interested in the original plan of the enterprise; he was then only interested in recouping the substantial sum he had expended during the two previous years toward getting the housing project established. The respondent contends that the petitioner did not withdraw from the joint venture at the end of 1947. He points out that there is no document or record of the petitioner's announcement of withdrawal and that the petitioner continued to contribute his share to defray the operating expenses of the enterprise in 1948. He also calls attention to the recital in the letter to the landowners in November, 1948, wherein petitioner requests an extension of the option, which indicates to him that the petitioner was still involved in the project well into 1948, and that he did not abandon it until some time in that year. Actually, the problem of determining what the petitioner had *204 decided to do, late in 1947 after the failure to obtain F.H.A. guaranty of the loan, is a matter of determining what his intentions were. We can make this determination only from all the surrounding facts and circumstances. . While we think that the record indicates that the petitioner had very little reason to be encouraged about the project in November and December, 1947, nevertheless it also indicates that the petitioner made a trip to Washington in the early part of 1948 on behalf of the project and still continued, at least in January and February of 1948, to contribute toward the operating expenses of the venture. Moreover, we do not think that the discussions in 1948 with Deal constituted a new enterprise. These discussions and the consideration of the project by Deal lasted into June, 1948, and while the best that petitioner might have hoped to realize from these discussions was reimbursement for his expenses, it appears that such a result would not have been an unacceptable proposition to the petitioner and his associates. Then, there are the further negotiations with the property owners in September and October, 1948, *205 which indicate that the project was still a possibility - even after the Deal discussions had ended. We do not think that it was until some time after these negotiations in 1948 that the petitioner and his associates finally abandoned their project. Therefore, the respondent's determination that the loss incurred by the petitioner on the venture can not be deducted in 1947 must be upheld. Decision will be entered for the respondent. Footnotes
*. 1 SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business;↩